United States of America versus Daniel Ochoa. Good morning. May it please the court. My name is Gail Stage, and I represent Mr. Ochoa. At the outset, I want to apologize to the court. I have a chest cold, and I have a lozenger here just in case. Whatever you need, don't worry about it. I start going crazy. We're here today on a case that emanated from one indictment and turned into two different trials. Mr. Ochoa was charged with Hobbs Act robbery and using a gun during in relation to a crime of violence. He was also charged with being a felon in possession. The felon in possession charge was severed, tried separately, tried to a mistrial, and then ultimately it was dismissed on the Speedy Trial Act. We've raised several different issues in the case. I'm not sure what issues the court was most interested in, but I wanted to particularly address the fact that the magistrate judge and the district court judge both relied upon the public safety exception when they determined that questioning of Mr. Ochoa after he'd been arrested outside of his home before he had been given any Miranda warnings was appropriate based upon the public safety exception. Now, the public safety exception was created essentially by the United States Supreme Court in New York versus Quarles. And in that case, the court essentially said, yes, we have to Mirandize witnesses that are in custody. But based on exigent circumstances, confusion, a kaleidoscope of various factors, there may be a public safety exception in which police officers can ask questions of a suspect regarding the location of a gun or other dangerous instrumentalities that might put the public or the police in danger. Now, in Quarles, the court made it very clear that this is a narrow exception to Miranda. And the court has repeatedly stated in later Supreme Court cases that Quarles is to be narrowly construed. The facts of Quarles is that a woman flagged down a police officer. She told the officer that she had been raped and that the man who raped her had a gun and he ran into a supermarket. The police ran into the supermarket. They located the gentleman. His holster was empty. They threw him to the ground. They cuffed him. There was no question that he was in custody at the time. And they said, where's the gun? And the United States Supreme Court said, in that instance, you have people milling around. You have people that might pick up the gun and use the gun. And so the police, for public safety reasons and their own police officer safety reasons, we want to find out where the gun is. And in later cases in which both lower courts and the United States Supreme Court has upheld the public safety exception, the facts of those cases show that usually, almost always, the gun is either near the suspect. The gun is either in a room where there are other people, potentially. In this case, the magistrate judge and a district court judge relied upon an 11th Circuit case, United States versus Newsom. What do you see as the differences between this case and Newsom? In Newsom, there was information that a gentleman was in a hotel room with one person for definitely and possibly two other people and that he had a gun. In our case, while Mr. Ochoa was being arrested for possibly shooting a Brinks messenger, there was absolutely no evidence that he had a gun on his person or that there was a gun in the house. Excuse me. Couldn't a police officer fairly assume that a suspect they believed had robbed a Brinks delivery person might have had weapons and might have had associates who would be interested in using those weapons? Yes. And there are a few wrinkles in this case that I think set it apart from even the supplemental authority that the government put before the court. In that case, the gun, the gentleman, there were children in the house, and the environment was becoming more and more hostile. The gun was in the house. The police knew there was a gun in the house. In this particular case, the police had an arrest warrant. They went to the home in the early morning hours. They took the occupants out of the home. They secured the occupant. They were essentially in custody. That is conceded by the government. It's undisputed. The SWAT team leader, Agent Swinnerton, asked, which I believe would fall within the public safety exception, is there anybody else in the house? And was given an unequivocal answer of no. There's no one else in the house. He also asked, are there any dangers to my police officers? Are there booby traps? Are there weapons? Is there anything that's going to hurt them? And the oldest gentleman who was at the scene said no. Now, Agent Swinnerton knew who Mr. Ochoa was. He had done a little bit of research about Mr. Ochoa. He decided, and this is where we separate from the public safety exception, he decided that he didn't think that Mr. Ochoa was being straightforward. And in his words, he said he decided to, quote, press the issue. I looked at Mr. Ochoa, and I said, you know we're going to find something. If there's something in there, you know we're going to find it. Now, at this time, the situation was not the kind of situation that we have in New York versus Quarles. It's not a kaleidoscope of confusion where police officers are having to make quick decisions and maybe can't artfully ask the kinds of questions. There's no reason Agent Swinnerton could not, number one, have Mirandized Mr. Ochoa. Is the only thing you're trying to suppress from that Ochoa statement, there was a handgun in the dresser in one of the bedrooms, is that the first thing you're trying to suppress? That particular statement, yes, Your Honor. OK, because when they did do the sweep then, they didn't find any guns. They only found the gun, excuse me, they didn't find the gun. They found the ammunition in the drawer. That was only when they had a warrant, right? That's correct. What happened? Basically, what you're trying to do is start with this first entry or this first statement. I guess it's not even an entry. You're not even challenging the SWAT team could go in and do the safety sweep. In fact, they never found anything from that, right? No, Your Honor. They didn't take any evidence from the safety sweep. Agent Swinnerton specifically testified that his men were in a holding pattern at that time. No, but there's no evidence that they obtained from the safety sweep they did. They did not look in any drawers. They didn't do anything. They went in. They were looking for two-legged dangers to the police officer. And then they came back out, and then they went and got a warrant. What Agent Swinnerton did is call the task force leader, Agent Starkey, and said, we know now that there's a gun here. They already had an arrest warrant. I'm not sure in this case why they didn't also get a search warrant if they believed that Mr. Ochoa was involved. In any event, let me go back to your point then. What Swinnerton said is he pressed the question again because based on Ochoa's facial expression, he thought there might be something in the house that he needed to know about before sending the members of the team in. That's basically this total sum of it, correct? Well, yes, Your Honor. But at that point, we're back to it. OK, so why was that not a reasonable basis to say, tell me again, Ms. Ochoa, are you sure there's not something in the house that we need to know about? In the public safety cases, Your Honor, police officers typically know about a gun either on the person, near the person. In the 11th Circuit Spork case, which has been cited by the parties, the officer actually saw pipe bombs in the car in the supplemental authority that the government filed. So tell me what your best case is out of all the ones you've cited. Well, to be honest, my best case is essentially the dissent in Quarles in that what the dissent is saying in Quarles is that you can't let this exception swallow up the rule, that you can't let Miranda set down a very careful rule that was followed for years. And I want to make sure I have it. Basically, he asked him twice. This wasn't like a prolonged questioning outside the house. Correct? It was very short. It was not prolonged. That is correct, Your Honor. And he basically said, all right, tell me, are there any bombs, booby traps, weapons, anything that could be harmful? And he said, no. So he said, I pressed the question again. Listen, you know we're going to end up finding stuff. I don't want anybody to get hurt. You have to let me know if there's anything that could hurt my guys before we go in. He wasn't even asking if there was a gun. And then your client just volunteered, well, there's a handgun in the dresser. That's how it came down, right? Yes, Your Honor. So that's what we have to do. All of those questions that Your Honor just laid out. Well, there were two questions he asked. Well, is there anything in there? Can somebody get hurt? We're going to find it. Well, it was all in one sentence, by the way. Well, it is in the tone of an interrogation versus simply a question for safety. What other issue do you want us, you've got to? I'll rely upon my briefs for the remaining issues. Thank you. Good morning, Your Honors, and may it please the court, counsel. My name is Janae Hernandez, and with me at counsel table is Daniel Cervantes, who prosecuted the case in district court. On August 15th of 2014, the defendant robbed a Brinks armored car carrying $30,000 in cash. When the 72-year-old Brinks messenger carrying the cash failed to immediately turn over the bag with the money, the defendant shot him in broad daylight and cold blood. Nothing in the appellant's briefs warrant overturning the defendant's convictions and sentences for his crimes. Specifically with respect to the defendant's pre-Miranda statement, the record clearly shows that the district court did not err in denying the defendant's motion to suppress his pre-Miranda statements. Specifically, the questions that Agent Swinerton asked were, are there any weapons? Are there bombs? Are there booby traps? Any hazardous materials? Anything that we could encounter and find that could provide harm to anybody making entry into the house? But let me ask you something, and I think, you know, the law on this is pretty clear. But just because I'm interested, I mean, don't you think that the agents would have taken exactly the same precautions in doing their safety sweep of the house as they did when Mr. Ochoa answered there was a gun if he hadn't answered there was a gun? I mean, don't you think they would be equally as cautious? Your Honor, I think there's always value in obtaining information. Whether the SWAT team would have nevertheless conducted the sweep, because obviously they couldn't take the defendant's or the other individual's answers at face value. That's a separate matter. The fact of the matter is asking... But that's the question I'm asking. So the question is, do we have any reason to believe the SWAT team would have just cavalierly gone in had Mr. Ochoa said no or not answered? Or do you think they would have taken the same care that they took when Mr. Ochoa said there's a gun in the drawer, or there's a gun in the house? I think they would have been cautious, but having the information that there was a firearm in the house, I think really ramped up their caution in this case. Let me ask you this. And their warning did provide value. What's the difference between, if they're worried that there's another person there, even if there is not a firearm in the house, don't they have to worry that the other person has come armed with his or her own weapon? Absolutely. So why wouldn't they have been exactly as cautious in going into the building as they were when Mr. Ochoa said that there was a weapon in the house? Because after Mr. Ochoa said that there was a weapon in the house, that already confirmed what they previously could only suspect. And I think that's where the added value of asking the question comes in. It's one thing to think that there are items that could cause harm, and it's another thing to know— Messenger. So you don't think that they would have been suspicious if he had said—that they would have used the same amount of care and would have been suspicious if he had said there's nobody else in the house and there are no other weapons? I mean, after all, they didn't believe him when they said there was nobody else in the house, right? They absolutely were right to be cautious. And I do believe that they would have exercised a great deal of care when going in the house because of all of these unknown factors. And a gun isn't really like a booby trap, right? I mean, a gun can't fire itself. That's correct. You're on. Okay, so a gun doesn't present the same kinds of dangers, unless there's another person in the house, as a booby trap would present, right? Absolutely. Yes. Okay. So, I mean, could you—and I understand we are bound by the Supreme Court in this case and also by our own case law in this, but I wonder if there is a basis for looking at a gun in a different way, perhaps, when there's nobody in the house than there is in looking at a booby trap or a bomb or something of that nature. I think there is definitely a distinction to be made, Your Honor, because as Agents Winterton testified below at the suppression hearing, guns can't fire themselves. I think that's the point that Your Honor is getting at here. I definitely agree. However, given the evolving nature of the arrest and given the fact that this is all 6 o'clock in the morning, they have very limited information, as Agents Winterton testified below. He didn't know how many people would be in the house. He didn't know whether there would be someone in the house. They had conducted surveillance on the site, but that didn't provide them with the exact number of people that would be in the house when they were making the arrest. So I think— Let me ask you this. What's to stop any law enforcement officer from asking the question before going into a house, whether there's a gun in the house, before Mirandizing the person? Well, I think— Could anybody just do it and the public safety exception would be applicable? Absolutely not, Your Honor, and I think these facts, under these facts, it was warranted. For some of the points that the court made earlier, the fact that the defendant had previously not just robbed an armored Brinks car while armed, but he had actually discharged the firearm. He had shot the messenger in the leg. I think that rightfully put the SWAT team on high alert and made them very nervous about the situation. That's not it. That's why they could ask the question. That's not just it. In addition to that, they were aware, as Agents Winrich and Testify below, they were well aware of the defendant's criminal history in this case. In April of 2014, just a few short months before executing this arrest, the defendant had just been released for a homicide, so also involving a firearm. So, I think taking those circumstances together, the fact that the defendant has a very severe criminal history, the fact that the allegations— But is there any evidence these officers knew about that? I looked at the timeline. He actually had only just gotten out of jail four or five months on a second degree murder before he did this robbery. How do we know that? I didn't know there was any evidence these officers knew his priors. The officer, Agent Swinerton, did testify below that he was aware of the allegations as well as the defendant's criminal history. Oh, he said that. Huh. Okay. He asked those questions—or, excuse me, I believe he answered those questions on direct but also on cross-examination, where defense counsel below asked specifically, what information did you have about the defendant? And Agent Swinerton indicated that he knew, basically, the bare bones of the allegations as well as the defendant's criminal history. And so, I believe the defense counsel brought up United States v. Newsom, which I believe the district court correctly relied on in this case. In Newsom, the defendant, just like the defendant in this case, was alleged to have shot and not fatally injured his wife and his son a few days prior to the arrest. And so, the team there was very concerned about their own safety as well as the safety of other people who may have been in the vicinity of the hotel where the defendant was staying at when they went to execute the arrest. In that case, the officers knocked on the door, the door opened, they didn't immediately see anyone, they went in, saw the defendant, neutralized him, they handcuffed him, and so they asked him these questions for their own safety. And I think what that indicates is that it's not just a matter of, do you have the subject apprehended, and for lack of a better word, neutralized in the moment, I think the analysis is more in-depth, it's multifactorial in that way. You have to consider the history of the person being arrested, the potential dangers that the agent's conduct in executing the warrant. I'll also note, I believe the court had some questions about the impact of this statement. Just for the record, this statement was not introduced in the Hobbs Act robbery trial, it was introduced in the 922G trial. The statement, although it was used in the, it was part of the probable cause that went into the search warrant, the district court specifically found that the independent source doctrine applied. And that was not challenged below by defense counsel, and I don't believe that it was raised in appellate counsel's briefs either, but I did want the record to be clear with that respect. So everything that came from the warrant is subject to the independent source doctrine, even if the court were to take issue with the pre-Miranda statement. Unless the court has any other questions, I would ask that this court . . . I'm going to ask you this because I want defense counsel to be prepared on it in reply. I was confused because I looked at the gun count here, the ammunition count, and y'all charge the gun that was found outside in the yard and the three magazines, but at trial everybody argued in opening and closing about, well, the ammunition in the dresser drawer was enough to convict him, and nobody raised any objection about the indictment. Are you aware that the indictment didn't include the ammunition in the drawer? Your Honor, I have to admit I'm not . . . I don't think anybody was. Okay. That was something . . . I went back to look at the indictment as I always do, see what's defense counsel doesn't raise it, trial counsel didn't raise it either, that we were really amending the indictment, and then if you go to look at the jury charge, it's charged in the or. The indictment says and, but the jury charge is or, and everybody was talking about the ammunition in the dresser drawer. Everybody talked about he was possessed constructively, the gun and the ammunition outside, and there was some Hornaday ammunition outside, there's some Hornaday ammunition in the dresser drawer, but it seemed like the jury was allowed to consider the dresser drawer ammunition, or at least there's a possibility that was part of the verdict, but everybody seemed maybe it's because he was on notice of it, so you don't know anything about that. It looked to me like at the whole trial nobody even paid attention to that. Right. I have to confess, Your Honor, I did not look at that particular portion of it. I would say that . . . And it's not raised in the brief by the defendant, either in the original or reply brief. That's correct. It may be that given that the ammunition was aggregated and charged in the aggregate in the indictment, that may have led to some confusion, however, I would say that the evidence presented . . . Yeah, but you count the bullets in the indictment, and those are matched, the number of bullets are in the magazines out in the yard, so you'd need four more rounds to get the ammunition in the drawer, which is not charged, or the magazine in the drawer, there's also a magazine in the drawer, too. Anyway, you've answered my question. I was just saying that because I'm going to ask her about it, and you're not going to have rebuttal. I wanted to know what you said. You've answered the question. Thank you. Thank you, Your Honor. Thank you, and I ask that the Court affirm the defendant's convictions and sentences below. Well, thank you for giving me a heads up, Your Honor. I also am not aware of the fact that the ammunition was not charged. Were you the trial counsel? No, ma'am. I assume you are. Right. But I do know that in the government's brief, they argued that even if the gun somehow went in a way that the ammunition in the drawer could be used to convict. Everybody argued that at trial, too. You have a choice. You've got the gun outside, you've got the ammunition, and there's a circumstantial evidence case for the ammunition outside. I got that, but it was clearly his room. It was overwhelming evidence that that was his room, and overwhelming evidence that was his drawer, so that was an easier charge is all I'm saying. I do agree. I think there was also evidence, though, Your Honor, that other people occupied the room, and there was no DNA evidence, no fingerprint, but there was . . . I understand it's a fact issue for the jury, but there was still a lot of evidence that he did occupy the room, since his driver's license . . . Some of his items were, yes, absolutely. You've answered my question. Go ahead to your argument. Okay. Actually, before you do, do you think it would have been plain error, then, that . . . let's say that we found that you couldn't use the statement. Would it have been plain error for the court, then, to have relied on the ammunition that was in the drawer? Yes, Your Honor. Why is that? I believe so. If it was not properly charged in the indictment, then there would have been a Fifth Amendment violation. The grand jury, obviously, didn't indict as to that particular ammunition, and therefore, it would not have been a basis to convict the defendant. I also wanted to point out, in terms of what Agent Swinnerton knew and didn't know . . . Let me tell you the problem. If you have the independent source doctrine, they are still going to find the ammunition in the drawer. This is not about anything other than a constructive amendment of the indictment. Well, that's interesting. Why wouldn't they not have the independent source to find the ammunition in the drawer? They got a search warrant. They didn't find anything in the sweep, okay? So they go get a search warrant, and they did have an arrest warrant, but they go get a search warrant, and then they find the ammunition in the drawer. So I don't understand how you'd have allowing the evidence of the ammunition to come in to be a problem. Help me with that. Well, Your Honor, first of all, there was no search warrant originally issued in this case. What happened was you had the arrest warrant they were going to get Mr. Ochoa and take him in for questioning. Solely based on Mr. Ochoa's statement that there was a gun in the house, Agent Swinnerton contacted Agent Starkey and told him about that, and Agent Starkey used that statement to obtain a search warrant. I thought that was one of many things in the application for the search warrant. Agent Swinnerton testified that he reached out to Agent Starkey and said, I now know there's a gun in the house, and Agent Starkey used that information to obtain a search warrant. So we don't know at that time if there would have been any search of the house or the yard or anything. Now it's very possible after questioning Mr. Ochoa they would have been able to obtain a search warrant. I don't know why they didn't obtain one sooner. But in terms of what Agent Swinnerton knew about Mr. Ochoa, he was briefed on the Brinks robbery. He said he knew he was a convicted felon. I don't think there's anything in the record, and I just reviewed Docket Entry 117, which is the transcript of the motion to suppress. Was the statement about the firearm, I assume, not the only thing in the search warrant? I'm sorry. I don't have a copy of the search warrant with me. But I do have Agent Swinnerton's testimony in which he said they did not have a search warrant, but he relied upon the fact that he learned that there was a gun in the house to reach out to Agent Starkey and have him obtain a search warrant. And Agent Starkey also testified that based on that information, he obtained a search warrant. So are you about to argue that he knew he had a criminal history, but he didn't know what the history was? There's nothing in the record that I can see. I just reviewed the transcript. Again, he was briefed on the general situation. He knew what Mr. Ochoa looked like. He knew he was a convicted felon. And that's the information that he had when he was questioning Mr. Ochoa. Thank you, Your Honors. Thank you, Counsel.